Takeda Chemical v. Ranbaxy Labs Next case is Takeda Chemical v. Ranbaxy Labs, 06-1364, Ms. Mazzocchi. Thank you, Your Honor. Mazzocchi. When the PTO issued its critical Section 1 patent rejection that the specification of the 777 patents did not enable the suggested claim to unexpected results, it specifically asked the patentee, where are the control values? How does Table 1 prove that P-glitazole is actually the superior compound? And at this point in time, the PTO examiner had no reason to question the accuracy of the data that was in Table 1. How did Dr. Fujita answer the PTO? He answered with a declaration and attorney arguments that he testified he intentionally prepared to respond to these very issues. And what was in this declaration of remarks was simply not true. Dr. Fujita, for example, told the PTO that the missing control data. You're telling us a story, a historical story. You have an inequitable conduct issue by standard of review. What were the basic errors committed by the district court in review? The basic error of the district court related to both materiality and intent. First on materiality, the district court did not appreciate that the- Why don't you start with intent? Intent is often the weakest link in equitable conduct. That's fine. On the question of intent, what the district court focused on was whether Takeda internally had data that convinced it that P-glitazole was the superior compound. And respectfully, in light of the nature of the rejection from the PTO, which said your specification and the information presented within it doesn't permit you to make that claim. You haven't given enough data and information to enable the person skilled in the art to make that claim. It was erroneous for the district court to say that since Takeda had years of internal unpublished data, that that would somehow suffice as the proof that there was no intent to deceive the PTO. But the district court heard Dr. Fujita, who I think was the key person, heard lots of testimony, Judge Domena, and was apparently entirely convinced that there was no inequitable conduct. Well, the first problem is that- That's a steep hurdle for you to overcome. I recognize that, Your Honor. But first, Dr. Fujita's primary testimony in the case actually went in on paper. It was not presented at trial. In addition, the cross-examination, obviously, went through a translator. So the fact that he may have been- That means it's entitled to less deference? No, I'm just saying that the district court clearly was pleased with the fact that he was being careful and patient in responding to questions. But that doesn't necessarily get into what was his intent back when he was before the PTO. And again, the credibility determinations that she made, she said he had no motivation to lie to the PTO because, look, Takeda eventually commercialized people at his own, and Dr. Fujita-  Right, and they presented data to Upjohn. But the thing is, is that the memoranda that Dr. Fujita was presenting to Upjohn, for example, that memoranda included the actual control group data. It didn't misdescribe test protocols. It had data for the unsubstituted compound, and it had the chick lens assay that the district court identified as being the very powerful evidence. Having focused on that type of information, when the PTO examiner says, hey, that information seems to be missing from the specification, that's where the district court went wrong. She didn't understand that that would, how that would impact the enablement analysis as opposed to just a general unexpected results claim. And that was the key problem. Because think about what would have happened had Dr- Enablement analysis involves telling how to make and use. That's correct. Is that deficient? The PTO examiner thought that it was, and it's not- Tell me again how the PTO examiner thought the specification didn't enable one of ordinary skill to make and use this very small group of compounds. Right, what the PTO examiner was concerned about is that Fujita had stated in the specification that the 5-ethyl and that the structure of the 5-ethyl is what conveyed superior properties to the molecule. But the specification tells how to make 5-ethyl, right? That's correct. And it gives roughly some dosages concerning administration. This isn't a new drug application being presented to the FDA. It doesn't have basic information concerning how to make the 5-ethyl and use it. And there are only three other compounds. It's not like you've got a whole universe of compounds of different structural types that might be made and used in different ways. And there was no disclosure of that. I understand, but that's certainly not what Takeda responded back to the PTO with. I mean, the PTO- In other words, you're nitpicking the details of the communication rather than the basics of what's in the patent application as required by the law. Well, I think that the law says that your claims have to be enabled, but your specifications- Which of the four compounds can't be made by the techniques described in the specification? Your Honor, I agree that the synthesis of the 5-ethyl compound can be accomplished according to the specification, but- Is there a method of use, administration, oral, parenteral, for the compounds? How about column two? Go ahead. Bottom of column two. Well, the whole column tells how you formulate it in various dosage forms, how you administer it, even rough doses, milligram per kilogram of body weight, how many times a week. Isn't that a reasonably standard how to use formulation, a description for a pharmaceutical compound? I mean, I agree that that is more of like it typically shows up in pharmaceutical patents, but- Yeah, but it's more specific. It's 0.5 to five. All right. Right, but the fact of the matter is is that the PTO examiner was concerned that the specification didn't convey the information that the person of ordinary skill in the art would need to conclude that this 5-ethyl compound was a superior compound that even should be used- Sounds like a best mode argument. I think that- You mean the best mode wasn't disclosed? Well, you're not arguing that. But again- Your primary focus is on table one, right? That's correct. Okay. You made a motion on, I guess it was March 15th, 2005 to get additional notebooks that would support table one, and the district court denied that. Now, as I read your brief, you are not challenging on appeal the district court's action in denying that discovery request, correct? Well, the nature of the discovery request  No, what's the answer? Are you challenging on appeal the district court's action in denying that discovery request? We're not denying that she, we're not denying the discovery request per se. I mean, I understand that the district court has- You're not challenging the action on the discovery request. That's correct. Okay. But as I understand it, you are challenging her action on the eliminate motion, right? That's correct. And as I read the decision on the eliminate motion, she said, I'm not going to grant the eliminate motion because you never asked for the missing notebooks. That strikes me as potentially quite incorrect. Am I misreading the motion? I mean, her decision? No, we had asked for the notebooks in discovery and they never materialized. And again, this is operating under the assumption that these experiments are in fact contained within these missing notebooks, which also has never been established. But it's precisely because there's been no evidence that the experimental results that supposedly support the table one data were in notebooks in the first instance to then have Takeda come in and say, oh, well, they must've existed. They were just missing. You can't establish a foundation for making that statement without having seen the notebooks. I mean, that was the dilemma that Milo was put in is that Takeda can't say that the missing table one data is in missing notebooks if there's no proof that they were ever written down in notebooks to begin with. So when the district court then came back and said, and by the way, Milo, even though you've got data that contradicts the values that are put forth in table one, the fact that you can't show that what is in these missing notebooks is unreliable, that was clear error. If there's any burden to produce documents, it should be on Takeda as the document custodian. If they can't produce any documents, there's no reason to assume that these experiments were actually contained within those documents. You're well into your rebuttal time. Would you like to save it or use it? Oh, I'll save it, Your Honor. Okay. Mr. Viola. Thank you, Your Honor. I'd like to address Judge Dyke's question regarding the discovery issue because there may be a misunderstanding here. Back in March of 2005, Milo made a letter application to the district court for certain discovery relief. That relief included production of original laboratory notebooks, as well as a request that the court compel Takeda to respond to certain interrogatories. That portion of the request, which went to the notebooks, was not denied by the district court. It was not decided by the district court because in the interim... How do I know that? I find a docket entry here that says that the request was denied. I mean, just back up a moment. I mean, the missing notebooks were a big deal, right? In this whole inequitable conduct issue. Absolutely. Right, okay. So, as I understand it, they asked for the notebooks underlying table one. They got 28 of them. But then they said, we've looked at the 28. They don't support table one. We'd like the rest of the notebooks. That was never asked. The second part of that was never asked. There's a letter in the record at page 7308, 7309, by which the court was advised that parties had come to an agreement to resolve. 7308? 7308 and 7309. That's your response to their letter, isn't it? Yes. Okay. But what am I missing here? Does this letter in some way disclose that there'd been an agreement to produce the notebooks? Yes, you're on page 7309. It says, as a result of a series of compromises. Where are you reading? Oh, I see the middle of it. The second to last paragraph at the end, towards the end of the paragraph. Tegeda agreed to review its redactions and bring from Japan 28 original lab notebooks. Well, yeah, they got the 20 original notebooks, but this request was directed to the other notebooks, not to the 28. That they already had at the time of this letter. The parties resolved this dispute by agreement, as reflected in the letter. Well, I just don't see where the record supports what you're saying. There wasn't any dispute about the 28 notebooks at that point. I mean, the letter correctly says that you gave them the 28 notebooks. Problem is, they said, we looked at the 28 notebooks. They don't support table one. We'd like the rest of the notebooks. You say, you can't get them, and the district court says, you're right. I'm not gonna order production of them. That, I respectfully disagree. What the court denied was that portion of the application by which Milan requested interrogatory answers. That's all that was left for the district court. And Milan asked all about the search for documents at the deposition that occurred following this exchange of letters. They asked Dr. Odaka about the search and what had transpired and who had looked for what, and he testified that notebooks which had underlying raw data for certain of the values in table one could not be found. And there was no further request after that. There is no document request that anyone can point to after that for further information. And as we pointed out in the motion in one way, Milan never took discovery as to his document retention policies, how the laboratory notebooks were kept. Well, let me see if I can understand. The notice of deposition appears on 7310, right? The 30 B-Sec? There's a notice, I don't... And there's a schedule A topics for discussion, right? Yes. Is what you're saying that there wasn't a document request that accompanied the notice of deposition? The document requests had been made a year earlier. And they didn't cover any notebooks other than the 28? The document requests sought notebooks and 200,000 pages of notebooks were produced. Not just 28, 200,000 pages. No, I understand. But the question is, were there additional notebooks not produced other than the 28 that related to table one? No notebooks were withheld so far as I'm aware. And I think we made no bones about it at the trial that Takeda produced that was given to him. Did this deposition ever take place? Yes, sir. It took place for at least two days, as I recollect. And did they ask about the notebooks at the deposition? Repeatedly, over and over again. They went through notebooks in nauseating detail. Did they ask about whether there were other notebooks other than 28? They asked whether other notebooks had been looked for. And the answer was, yes, we've looked for them. And we've given you what we can find. Okay. And the witness was asked, what is the source as it is said here in page 73-12? What is the source of the data in table one? And the answer was report A-15-34. So your theory about the eliminate motion decision is that when the district court says they didn't ask for the notebooks, what you're saying is that there wasn't any request in connection with this notice of deposition for the notebooks, and that whatever earlier request had been made for the notebooks had been resolved by agreement with the production of the 28. And that which existed- Is that a question? Yes, and that which existed had been responded to. What I said was accurate. Yes. Yeah, okay. And my recollection of the motion eliminated, I believe, was Myron was asking the court to preclude Takeda from putting in evidence. Yeah, but the problem that I had with the decision on the eliminate motion, and I think it's at 6290, is that he says, I'm denying the eliminate motion because they never asked for the notebooks. And that seemed to me problematic. I think that what the court said was that at 6292, the ultimate conclusion was Myron argues that Takeda should be prevented from using alternative evidence, that is, its contemporaneous reports, to prove the content of the missing notebooks. That's the request that was sought. But Myron sought Takeda to be precluded from putting in evidence. The judge never prevented Myron from putting in evidence. No, but see, if you look at 6292 in line five, at no point during the discovery period, however, did Myron either take discovery concerning the missing notebooks or raise with the court Takeda's failure to comply with his discovery obligations in this regard. But that seems to me problematic. I believe, if one looks at the entirety of the briefing on this, what the court is referring to, what we argue was Myron did not take discovery about how were notebooks kept and maintained. Was there a central repository? What is the document retention policy? Is there a custodian? They didn't take discovery on all those sorts of things. The 30B6 didn't cover that? Did not, they didn't ask. No, that's what I mean, they didn't ask. And what the court, and what Myron then came in in the closing and limiting it is, said to the court, well, we want you to prevent Takeda from putting in any evidence about how the notebooks are kept and maintained and whether they're missing or not. And the judge said, well, if you didn't ask about it, I'm not gonna prevent Takeda from putting in evidence. What Takeda wants to do is say, at the end of page 6292, the district court said, well, Takeda can point out that you're not operating on a complete record. They can do that, and I will allow them to do that. And whether that carries a day or not is for trial, but I'm not gonna prevent Takeda from making that argument. Mr. Viola, you've responded to a lot of questions, a long line of, one line of questioning. Do you wanna tell us your main grounds for urging that we affirm? Yes, Your Honor, I would like to do that. I'd like to respond to one thing that Mylan's counsel had mentioned, and I think it came out in the course of her argument, that Mylan's real central focus on appeal is, has to do with enabling. And that argument shouldn't even be heard by this court. It was weighed, it was an invited error, it's gone. Because they told the district court that you, judge, should view materiality in this case from the spectrum of obviousness. And in our brief, we pointed out a quote from the trial brief, where they said that the court analyzed this from the point of view of obviousness. And now they come to you and say, the district court did what we asked, it analyzed this from the point of view of obviousness, but it should not have. And that, whether you call it waiver, estoppel, or invited error, is something that should not be permitted. Going beyond that, the enablement point doesn't make any sense. The theory, as I understand it on this appeal, is that Takeda committed inadmirable conduct because in responding to the examiner's question, which is now couched as an enablement question, Takeda did not disclose internal data of the check lines. How is that inadmirable conduct? The question of the examiner was, explain to me how to interpret the data of Cable 1. That was the question, and Mylan acknowledges that that was the question in its brief on page 34 and 40 and 45. During prosecution, the PTO examiner expressly sought confirmation that the test and data in the 7-7 patent specification were enabled. So of course they responded with an explanation of how to interpret the data in Cable 1. And the law is that enablement must be shown by information in the specification or the prior art, not internal data. So of course they didn't disclose, it didn't occur to them to disclose the check line data, which was internal data. So that argument makes no sense, and the fact that Mylan centers its entire appeal around this unpreserved, invalid, nonsensical enablement argument, I think, speaks volumes. The fundamental problem, though, that Mylan has here, not to burn the proof, it's very high, not clearly wrong, it's very high, the problem is they have no evidence of intent, have no evidence at all of any intent to deceive. They didn't put any evidence of any intent to deceive, and they have no evidence of any material misrepresentations or omissions. Throughout this case, what Mylan has done in terms of the intent element has been to rely on the hope that an inference of intent would be drawn from supposedly material misrepresentations. That's almost invariably the case. There's very few instances in which you have somebody who has signed a letter or an affidavit saying, you know what, we decided to see if we could slip this one by the examiner, and boy, did we succeed. You don't find very many of those cases. So to say, gosh, there was no evidence of intent is not really enough to get you over the problem, it seems to me, of whether there was enough basis for an inference of intent that should have been drawn in this case. I appreciate that, Your Honor, but I think that the decisions of this court and the law of this court is very clear that in order to draw an inference, there must be facts proven of record which would support that inference, and that if one is relying on a supposedly material misrepresentation or omission, that it's Mylan's burden to prove that the applicant knew the materiality of what was being omitted, and that was, I think, reinforced just a few months ago in this court's decision with Eli Lilly, where, with respect to an equitable comment, the court said, in a case involving an omission of material reference to the PTO, the record must contain clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference. There is no such evidence here. The only claim of misrepresentation in response to the enablement rejection that we heard was something about the control values. All of the evidence here is that Takeda analyzed, and Dr. Fujita analyzed these experiments on a percentage basis. They didn't look at the absolute values. The evidence of Takeda's experts was uniform in that the person who under his skilling art looks at these experiments on a percentage basis, and the finding of the trial court was that Takeda's response on control values to the examiner was factually accurate and correct. The absolute values of the control don't matter. The person of ordinary skilling art knows how to interpret. We put in evidence that that was truly correct, and that Takeda, Dr. Fujita, never used absolute values. He always used percentages. So where is the showing that even if they had some evidence somewhere that absolute values would have been material, that Dr. Fujita considered them material and intentionally without? There is not, and that is the same truth for each and every supposedly material omission on the surface of the page. I see that I have about 10 seconds left. The court has any questions of the evidence? We'd be glad to take it back. Take the 10 seconds back. Too late. Thank you, Mr. Zillow. Ms. Mazzocchi has a few moments, a few minutes. Thank you, Your Honor. First, I would like to point out that Claim 5 of the claim does refer to an anti-diabetic composition. So to the extent that the Table 1 data is presumed to demonstrate that the material is effectively an anti-diabetic compound, again, the PTO examiner's discussion of whether the 777 patent specification enables the person of ordinary skill in the art to reach those conclusions would, in fact, be relevant. Now, on the, and that gets back to what was the examiner himself looking at? He wanted to know where are your control values because even if you assume that the calculation starts at 100%, what your actual control value is dictates where that 100% value is. And when you're doing the head-to-head comparison of compounds, if your 100% standard is constantly varying, that undermines the ability to even make the head-to-head comparison. Similarly, when it comes to the safety method, I'm sorry, the safety margin methodology that Fujita gave the PTO, the examiner was keenly interested in how can you use this Table 1 data to conclude that P-agglutazone is the superior compound. And he gave them a methodology that is not the one that he used internally. The one that they used internally to demonstrate that P-agglutazone was the best compound was the Chitlins assay, and the district court repeatedly referred to that as the powerful evidence that P-agglutazone was the superior compound. Again, that's not found in the specification. So when you want to get, but Dr. Fujita knew about it. There's no question that he knew about it because the very memoranda that Takeda now says was the source of the Table 1 data, which was authored by Dr. Fujita, included all of that information. So there could be no question here that he had actual knowledge of this information and failed to give it to the Patent and Trademark Office. Is Mr. Viola correct that, one, you settled for the 28 notebooks and didn't have a discovery request for the others, and two, that you got your 30B6 deposition in which you were allowed to ask about the missing notebook? No, I do not agree with that. Which part of it? First, there was a discovery request for all of the documentation that underlie the Table 1 data. And to this day, they've never been able to- Did you ask for an order to produce documents that weren't produced in connection with that discovery request? Well, they made the representation to the court that there were no other documents. Okay, so what's the problem here? They said, they represented the court that there were no other documents. You didn't request that they be ordered to produce any additional documents, and you got your 30B6 deposition in which you could ask about whether there were additional documents that related to Table 1. Right, but that presupposes that there is Table 1 data contained in these documents that can no longer be found. But that's not a discovery problem, right? I mean, that's an evidentiary complaint about what they were allowed to do at trial, right? Well, no, I mean, if you- Where's the discovery problem? Because the discovery problem is that first, if you presume, the district court presumed that the Table 1 data must be present in missing notebooks. You can't tell- No, it doesn't have anything to do with discovery, right? I mean, to get right down to it, what did you ask for that you didn't get that exists, so far as you know? We did, what we asked for was the experimental records that underlay the Table 1 data. Okay, and they say, we've given you everything we've got. Right, and- So what was not given to you that you were entitled to that you didn't get? We didn't get, for example, the experimental records that underlay compounds C and D and E for the potency measurements in the Table 1 data. And the reason why that matters is- Well, they said they couldn't find them, right? But they said that they couldn't find the experimental records, but that doesn't necessarily mean that the experimental records actually existed to begin with, I mean, you know, that- But that's not, I'm having a hard time seeing why that's a discovery issue. I mean, your complaint seems to me is that they should not have been allowed to say these records existed when they weren't able to provide evidence that they did exist. That's correct. Okay, but not, your complaint, it seems to me, and correct me if I'm wrong, your complaint is not that they withheld records that exist. You don't think they exist either, truth be told. I don't think that there's any basis for the, I don't think there's any evidentiary basis experimentally for the numbers they put in Table 1. And the reason why is because, as I said, 200,000 pages of notebooks seem to exist from the time frame except for this critical information that underlies the 71710. Which just isn't there, and you ascribe its absence to the fact that the work was never done, they ascribe it to the fact that it was lost, but in either event, you could do discovery for 20 years and they wouldn't show up, right? So it's not a discovery issue. Well, but where the harm comes in is that the district court then promptly turned around and permitted Dr. Fujita to testify that he assumes that the records existed and that they must have gone missing, but there's no foundational support. In other words, you think the data didn't support the superiority of the compound, and this compound is a billion dollar compound that many people say is life-saving, and you're saying the data aren't there. What I'm saying is that the comparative, what's missing is the comparison data, the data comparing P-glitazone to the other compounds. We found evidence in Takeda's records that when you did a head-to-head comparison between, for example, P-glitazone and compound C, that the two performed equally well. Now, in table one, compound C is stated to be three times worse than P-glitazone, and the district court said, well, there's no reason why I should credit that evidence that you have, that's the actual experimental evidence. I'm just going to assume that the information that was in these mythical missing notebooks must be the most reliable data and that there was no problem with that presentation. But that was a credibility finding. You got your discovery. You got your 30B6. You got to ask whether there were any other notebooks. You got to ask whether there was or was not data supporting table one, right? I mean, you got everything you could ask for in discovery. The point is that you're saying that on this record, the judge should have made a finding that the notebooks never existed rather than that they were lost, right? What I'm saying is that the district court should not have permitted Takeda to introduce evidence that these notebooks went missing without either A, demonstrating that there was evidence in these notebooks to begin with, and or B, without laying a foundation where somebody testified that some type of search was done and that they did go missing. But you thought you had the opportunity to ask about whether the documents existed, how they were lost, what the record keeping was. You've got your deposition. You got your 30B6 on that, right? Right, but the- The yes, right? Yes. Yeah, okay. Ms. Mazzocchi, my blood sugar's running down without the benefit of any medication. And besides that, the time has long since run out. So we'll take the case under advisory. All rise. The order of the court is adjourned, the date of death.